**Linda S. KAISER, Pennsylvania Insurance Commissioner and Statutory Rehabilitator of National American Life Insurance Company of Pennsylvania (In Rehabilitation), Plaintiff,**

v.

**FIRST HAWAIIAN BANK, a federal banking institution, Defendant.**

**No. CV 96–00310 DAE.**

United States District Court, D. Hawai'i.

Aug. 15, 1997.

Robert Carson Godbey, Gilbert Jackson & Godbey, Honolulu, HI, for Linda S. Kaiser, National Life Ins. Co. of Pennsylvania.

Patsy H. Kirio, Watanabe Ing & Kawashima, Honolulu, HI, for First Hawaiian Bank.

*ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS 2 THROUGH 10 AND DENYING WITHOUT PREJUDICE DEFENDANT'S MOTION TO DISMISS COUNT 1*

DAVID ALAN EZRA, District Judge.

The court heard Defendant's Motion for Summary Judgment on June 30, 1997. Robert Godbey, Esq., and Jess Griffiths, Esq., represented Plaintiff Linda Kaiser, Pennsylvania Insurance Commissioner and Statutory Rehabilitator of National American Life Insurance Company of Pennsylvania; John Komeiji, Esq., and Patsy Kirio, Esq., represented Defendant First Hawaiian Bank. After reviewing the motion and the supporting and opposing memoranda, the court GRANTS Defendant's Motion for Summary Judgment as to Counts 2 through 10 and DENIES without prejudice Defendant's Motion to Dismiss Count 1.

## BACKGROUND

In December 1993, National American Life Insurance Company of Pennsylvania ("NALICO") and Investors Equity Life Insurance Company of Hawaii ("Investors Equity") entered into a Coinsurance Agreement. Under this agreement, Investors Equity agreed to indemnify NALICO for one hundred percent of the benefits provided by each coinsured policy. In return, NALICO ceded to Investors Equity annuity contracts with reserves in the amount of approximately $8.5 million dollars and transferred to Investors Equity cash in an amount equal to the reserves. Investors Equity was to maintain the assets in a Custodial Account with a fair market value equal to the amount ceded by NALICO, and any shortfall in the Custodial Account was to be funded by Investors Equity. *See* Coinsurance Agreement, attached as exh. B, Plaintiff's Concise Statement of Facts ("S/F").

The Agreement additionally provided that for the protection of NALICO and Investors Equity, a Custodian would hold assets equal to the net policy reserves on the coinsured policies. Except for withdrawals for the payment of benefits, no withdrawals from the

assets held subject to the Custodial Agreement would be made without the prior written approval of NALICO; however, assets held subject to the Custodial Agreement would be invested and reinvested at the sole discretion of Investors Equity so long as each asset was a permissible asset for investment by insurance companies at the value prescribed according to the insurance laws of Pennsylvania, Hawaii, and California. The Coinsurance Agreement further provided certain restrictions on the ability of Investors Equity to select securities, and specifically provided the mechanism by which NALICO could object to certain securities. *See id.* ¶ 1.3.

The parties then selected Defendant First Hawaiian Bank ("Defendant" or "First Hawaiian Bank") to act as custodian. A Custodial Agreement was entered into by all three parties in December 1993, "for the purpose of securing the payment by the Reinsurer of its obligations (the "Obligations"), now or hereafter existing, under the Reinsurance Agreement." Custodial Agreement, attached as exh. C, Plaintiff's S/F ("Custodial Agreement"). The Custodial Agreement contains the following relevant provisions:[1]

§ 2: *Establishment of Custodial Account; Deposit of Securities; Grant and Perfection of Security Interest in Securities on Deposit.* (a): The Custodian shall establish and, at all times hereafter until this Agreement shall be terminated pursuant to § 10 hereof, shall maintain an account which shall be entitled "National American Life Insurance Company of Pennsylvania Company/Investors Equity Life Insurance Company of Hawaii, LTD. Custodial Account" (the "Custodial Account"). The Custodial Account shall be established and maintained by the Custodian at its principal corporate trust office in Honolulu, Hawaii. Subject to § 5 hereof, all Securities deposited and held in the Custodial Account shall be held by the Custodian for the benefit of the Company.

(b): The Reinsurer shall acquire securities pursuant to the Investment Parameters and shall cause them to be deposited in the Custodial Account. Such Securities shall

have an aggregate Fair Market Value at least equal to the Reinsurer's outstanding reserves on the Contracts as of the end of the calendar quarter immediately preceding the date hereof. The Reinsurer shall, within 15 days of the end of each calendar quarter until this Agreement is terminated pursuant to § 10 hereof, deposit or cause to be deposited in the Custodial Account any additional Securities necessary to cause the aggregate Fair Market Value of Securities on deposit in the Custodial Account to be at least equal to the Reinsurer's outstanding reserves on the Contracts as of the end of such calendar quarter. *The Custodian shall have no responsibility to determine the Fair Market Value of Securities on deposit in the Custodial Account, whether the Reinsurer has deposited an adequate amount of Securities therein, or whether the Securities qualify under the meaning of the investment parameters.*

(c): The Reinsurer hereby grants to the Company a security interest in and on all if [sic] its right, title and interest in and to all Securities now or hereafter on deposit in the Custodial Account to secure the payment of all Obligations under the Reinsurance Agreement, which security interest shall continue in full force and effect until this Agreement is terminated pursuant to § 10 hereof.

(d): The Company hereby constitutes and appoints the Custodian its agent for the purpose of perfecting, by possession, the Company's security interest in the Securities on deposit in the Custodial Account.

(e): The Custodian makes no representation or warranty as to the legality, validity or enforceability of the security interest in the Securities on deposit in the Custodial Account granted or perfected, in connection with this Agreement, and, except for holding such Securities in accordance with the terms and conditions of this Agreement, shall, have no duty hereunder in connection with the granting or perfection of such security interest. . . .

---

1. Section 1 of the Custodial Agreement defines the term "Company" as referring to NALICO, the term "Reinsurer" as referring to Investors Equity, and the term "Custodian" as referring to First Hawaiian Bank.

§ 3: *Substitution of Securities: Investments:* (a) The Reinsurer may substitute any Securities for those Securities on deposit in the Custodial Account if such substitute Securities have a Fair Market Value, as of the date of substitution, at least equal to the Fair Market Value of the Securities for which they are to be substituted, and further meet the Investment Parameters. *The Custodian shall have no responsibility to determine whether substitute Securities have such a Fair Market Value or whether they meet the investment parameters.*

(b) Upon the written order and direction of the Reinsurer, the Custodian shall invest any monies on deposit in the Custodial Account in Securities. Any such investments shall be deposited in the Custodial Account and, subject to § 5 hereof, shall be held by the Custodian in trust for the benefit of the Company for Obligations under the Reinsurance Agreement.

§ 4: *Payments to the Company:* If the Reinsurer shall have defaulted in the payment of any of its Obligations, Company shall give written notice to Reinsurer of the specific nature and, if applicable, amount of default. Reinsurer shall have thirty (30) days after receipt of such notice to remedy or cure any default not otherwise resolved by informal means. If any default is not remedied, cured, or otherwise resolved within said thirty (30) days, the Company shall give written notice thereof to the Custodian (with copy to the Reinsurer). Such notice shall, in addition, specify the amount of Obligations due the Company and shall instruct the Custodian to sell and reduce to cash the Securities specified therein and to pay over to the Company the proceeds thereof in the amount equal to such Obligations. Promptly after receipt of such notice, the Custodian shall sell and reduce to cash the Securities specified therein and pay over to the Company the proceeds thereof in the amount equal to such Obligations, as specified in such notice. Any such proceeds in excess of such amount shall not be paid over to the Company but shall be retained by the Custodian in the Custodial Account.

§ 5: *Payments to Reinsurer:* (a) If the Reinsurer shall notify the Company in writing that the Fair Market Value of the Securities on deposit in the Custodial Account exceeds the Fair Market Value of Securities required to be maintained in the Custodial Account by the Reinsurer pursuant to § 2 hereof, the Company shall promptly thereafter instruct the Custodian in writing to release to the Reinsurer an amount of Securities (which Securities shall be specified in such instructions) having a Fair Market Value not greater than the amount of such excess. The Custodian shall release to the Reinsurer the Securities specified in such instructions promptly after receipt from the Company thereof. . . .

(c) The Reinsurer shall be entitled to receive all payments of interest and dividends with respect to the Securities on deposit in the Custodial Account. Distributions of such income shall occur pursuant to § 5(a).

§ 7: *Rights and Duties of the Custodian:* (a) The Custodian accepts the trusts hereby created and agrees to perform the duties herein required of it and to exercise the rights, powers, and privileges herein conferred upon it, upon and subject to the terms and conditions hereof, and agrees to receive and disburse all assets actually received by it hereunder, but only upon the terms of this Agreement. The Custodian shall not be answerable or accountable except for its own negligence, willful misconduct or gross negligence.

(b) The Custodian shall have only such duties or Obligations with respect to the Custodial Account as are specifically set forth in this Agreement and, except as aforesaid, no implied duties or Obligations in respect thereof shall be read into this Agreement against the Custodian. . . .

§ 10: *Termination:* This Agreement and the trusts created hereby shall terminate upon the final distribution by the Custodian to the parties in accordance with § 4 and § 5 hereof of all Securities or other property or proceeds on deposit in the Custodial Account.

Custodial Agreement (emphasis added).

In January 1994, NALICO transferred approximately $8 million in cash into the Custo-

dial Account. In March 1994, Investors Equity informed First Hawaiian Bank that it intended to deposit into the Custodial Account Remic Bonds ("Remic Bonds"), with an alleged fair market value of $2,703,918.00, and Meadows Metro District 1 Bonds ("Meadow Bonds"), with an alleged fair market value of $6,730,371.00. *See* exh. G, Plaintiff's S/F. Investors Equity then instructed First Hawaiian Bank to transfer $8,225,523.74, to Investors Equity's accounts at Nomura Securities, Smith Barney Shearson, and ADM Investors Services, Inc. once the initial substitution was made. *See id.* Thereafter, Investors Equity deposited into the Custodial Account $5,500,000.00 of Meadows Bonds and $4,617,326.00 of Remic Bonds. *See* exh. H, Plaintiff's S/F.

In April 1994, NALICO objected to this acquisition on the basis that the substitute assets did not satisfy the quality or valuation requirements of the Coinsurance and Custodial Agreements. NALICO directed Investors Equity to take remedial action. *See* exh. I, Plaintiff's S/F. Thereafter, in May 1994, NALICO wrote a letter to First Hawaiian Bank and requested that no substitution of securities occur or cash be removed from either account without NALICO's written notice. *See* exh. K, Plaintiff's S/F.

Investors Equity was placed into statutory rehabilitation by a Stipulated Rehabilitation Order dated June 24, 1994, and entered in the Circuit Court of the First Circuit of the State of Hawaii. By order entered December 29, 1994, Investors Equity was placed in statutory liquidation. NALICO made demands on Investors Equity's liquidator that the custodial account be turned over to NALICO, but the liquidator has rejected NALICO's demand.[2]

By order of the Pennsylvania Commonwealth Court dated January 31, 1995, NALICO was placed in rehabilitation and Linda Kaiser, Pennsylvania Insurance Commissioner ("Plaintiff"), was appointed statutory rehabilitator. NALICO, by and through Linda Kaiser as statutory rehabilitator, now seeks relief from First Hawaiian Bank.

Plaintiff first asks that First Hawaiian Bank turn over the collateral, assets and security held in the Custodial Account. Plaintiff additionally seeks to hold First Hawaiian Bank liable for the approximately $8 million dollars deposited into the Custodial Account on theories of breach of contract, negligence, gross negligence, breach of fiduciary duty, fraudulent misrepresentation, and fraudulent transfer.

### STANDARD OF REVIEW

Rule 56(c) provides that summary judgment shall be entered when:

> [T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the initial burden of demonstrating for the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). However, the moving party need not produce evidence negating the existence of an element for which the opposing party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548.

Once the movant has met its burden, the opposing party has the affirmative burden of coming forward with specific facts evidencing a need for trial. Fed.R.Civ.P. 56(e). The opposing party cannot stand on its pleadings, nor simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987); Fed.R.Civ.P. 56(e). There is no genuine issue of fact "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

A material fact is one that may affect the decision, so that the finding of that fact is

---

**2.** At the hearing, Plaintiff represented that approximately $4 million dollars worth of assets remain in the account, consisting of the bonds as well as other assets including $1.8 million worth of T–Bills placed into the account by Investors Equity after NALICO objected to the bonds. The responsibility for the underlying obligations has shifted back to NALICO from Investors Equity.

relevant and necessary to the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue is shown to exist if sufficient evidence is presented such that a reasonable fact finder could decide the question in favor of the nonmoving party. *Id.* The evidence submitted by the nonmovant, in opposition to a motion for summary judgment, "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255, 106 S.Ct. 2505. In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law. *Id.* at 254, 106 S.Ct. 2505. The court must assess the adequacy of the nonmovant's response and must determine whether the showing the nonmovant asserts it will make at trial would be sufficient to carry its burden of proof. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

At the summary judgment stage, this court may not make credibility determinations or weigh conflicting evidence. *Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir.1990). The standard for determining a motion for summary judgment is the same standard used to determine a motion for directed verdict: does the evidence present a sufficient disagreement to require submission to a jury or is it so one-sided that one party must prevail as a matter of law. *Id.* (citation omitted).

### DISCUSSION

For purposes of this motion, Defendant First Hawaiian Bank accepts all of Plaintiff's allegations as true. Defendant relies upon the express terms of the Custodial Agreement to conclude that it had no duties to Plaintiff to police the Custodial Account and is therefore entitled to summary judgment as a matter of law.

**3.** In its Opposition, Plaintiff additionally alleges that transferring funds before receiving the substitute securities breached the Custodial Agreement. This claim for breach of contract is not contained within Plaintiff's Complaint and thus may not be considered. *Masson v. New Yorker Magazine, Inc.*, 686 F.Supp. 1396, 1401 (N.D.Cal.1987), *aff'd*, 881 F.2d 1452 (9th Cir. 1989), *rev'd on other grounds*, 501 U.S. 496, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991); *see Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526,

### I. *Counts 2 & 4: Breach of Contract*

■ In Count 2, Plaintiff alleges a breach of contract claim based upon Defendant's "permitting substitution of securities for cash." Complaint, ¶¶ 50–53. Specifically, Plaintiff maintains that because nothing in the Custodial Agreement permits securities to be substituted for cash, Defendant breached the Agreement by permitting securities to be substituted for over $8 million without NALICO's consent. *Id.* In Count 4, Plaintiff alleges that Defendant breached the Custodial Agreement by releasing cash from the Custodial Account.[3] *Id.* ¶¶ 57–60.

Defendant moves for summary judgment on these two claims, contending that the Custodial Agreement authorized and required Defendant to facilitate the acquisition of the Meadows and Remic Bonds without assessing the value of the acquired securities or obtaining consent from NALICO.

In opposition, Plaintiff maintains that Defendant's actions did not comply with the terms of the Custodial Agreement. Specifically, Plaintiff states that the requirement in § 3(b) that Defendant invest funds after written instruction from Investors Equity "implies at least a minimal check and balance on the initial acquisition of the securities." Moreover, Plaintiff contends that the Custodial Agreement is "extremely specific about the requirement for pre-approval of NALICO for withdrawal of assets." Plaintiff's Memorandum in Opposition at 24, 25.

■ "The interpretation of a contract is a question of law." *Temple Univ. v. Allegheny Health Educ. & Research Found.*, 456 Pa.Super. 314, 690 A.2d 712, 714 (Pa.Super.1997) (quoting *Halpin v. LaSalle Univ.*, 432 Pa.Super. 476, 639 A.2d 37, 39 (Pa.Super.1994), *appeal denied*, 542 Pa. 670, 668 A.2d 1133 (Pa.1995)).[4] Further, "[i]t is well

103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("It is not, however, proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the ... laws in ways that have not been alleged.").

**4.** The parties agree that Pennsylvania law governs the contract claims, as provided for in the Custodial Agreement and that Hawaii law governs the tort claims, as the situs of the alleged torts.

established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Id.* " 'When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed.' " *Id.* (quoting *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (Pa.1982)).

The Custodial Agreement expressly provides that Investors Equity may substitute any securities for those securities on deposit in the Custodial Account and that the Custodian has no responsibility to determine whether the substitution is equivalent. Custodial Agreement, § 3(a). Further, the Custodial Agreement states that "[u]pon the written order and direction of [Investors Equity], the Custodian *shall* invest any monies on deposit in the Custodial Account in Securities." *Id.,* § 3(b) (emphasis added).

The transactions by which Defendant facilitated the acquisition of the Remic and Meadow Bonds clearly fell within the scope of § 3. First, as noted by Defendant both in the motion and the reply, and not contradicted by Plaintiff in its opposition, Defendant did not hold cash in the Custodial Account. Defendant states that the $8 million plus dollars were held in the form of mutual funds and provides as evidence the account statement for February 1994. *See* Exh. D, Defendant's Motion. Plaintiff was aware of this fact. *See* Exh. E, Plaintiff's S/F (Letter from NALICO dated March 15, 1994, recognizing that the funds were "invested in a money market fund yielding three percent."). The money in the Custodial Account was therefore held in the form of securities. *See* HRS § 485–1 (defining term "securities"); *State ex rel. Comm'r of Sec. v. Hawaii Mkt. Ctr., Inc.,* 52 Haw. 642, 648–49, 485 P.2d 105, 109 (1971) (defining "securities" in practice). As such, the exchange of assets from mutual funds into the Remic and Meadow Bonds falls squarely within § 3(a) of the Custodial Agreement.

Plaintiff argues, however, that the conversion of these assets into cash before the purchase of the Remic and Meadows Bonds [5] takes the transaction outside the scope of § 3(a). Even if the court were to accept this argument, § 3(b) of the Custodial Agreement specifically permits Defendant to "invest any monies on deposit in the Custodial Account in securities" upon the written order of Investors Equity. The Agreement does not provide any type of veto provision *or* notice provision to NALICO.

It is undisputed that Investors Equity sent written notice to Defendant on March 23, 1994, to receive Remic and Meadows Bonds and upon this receipt, to transfer funds in the amount of $8,225,523.74. Whether this exchange is characterized as a "substitution," as Plaintiff insists, or as an "investment" of securities, it is precisely the type of exchange envisioned and covered by § 3 of the Custodial Agreement.

This exchange was not a "release" prohibited by § 5(b) without NALICO's permission. Section 5 pertains to releases of Securities and payments of interest and dividends, *to Investors Equity* directly, when the fair market value of the securities exceeds the amount required to be in the account. The funds transferred from the Custodial Account was sent to three separate investment accounts at three separate investment firms as *payment* for the substitute Securities. They were not transferred directly to Investors Equity as a distribution pursuant to § 5.

Moreover, it should be noted that nothing in the Custodial Agreement provided Defendant with the authority to refuse a substitution or investment of securities by Investors Equity. Moreover, the Custodial Agreement explicitly provides that "[t]he Custodian shall have only such duties or Obligations with respect to the Custodial Agreement as are specifically set forth in this Agreement and, except as aforesaid, no implied duties or Obligations in respect thereof shall be read into this Agreement against the Custodian." Custodial Agreement, § 7(b).

**5.** As evidenced by the payments made to Investors Equity's accounts at Nomura Securities, Smith Barney Shearson, and ADM Investors Services, Inc.

Because the distribution challenged by Plaintiff falls squarely within the coverage of § 3 of the Custodial Agreement with the corresponding release from responsibility from determining the fair market value of the substitute securities, the court finds that there is no evidence that Defendant breached the Custodial Agreement by accepting the Remic and Meadows Bonds and transferring funds in payment. Accordingly, the court GRANTS Defendant summary judgment on Counts 2 and 4.

## II. Counts 3 & 5: Negligence and Gross Negligence

In Count 3, Plaintiff alleges that because it was patently obvious that the securities substituted by Investors Equity were not of investment grade, Defendant acted in a negligent or grossly negligent manner by permitting these securities to be substituted into the Custodial Account. Complaint, ¶¶ 54–56. In Count 5, Plaintiff alleges that by releasing the cash as alleged in Count 4, Defendant acted in a negligent or grossly negligent manner. Id. ¶¶ 61–64.

Defendant maintains that there can be no duty imposed by tort law to assess the value of the securities where the Custodial Agreement specifically released Defendant from such responsibility. Reviewing Hawaii statutory law, Defendant argues that there is no basis for imposing such a duty under the instant circumstances, where Defendant was not involved in investment decisions. Defendant further argues that to impose such a

duty, where Defendant was merely acting in a ministerial role, would potentially subject not just it, but every escrow company and trust company to liability for the poor investment decisions of the depositors.

In response,[6] Plaintiff argues that there remains a genuine issue of fact regarding whether a reasonable banker, acting as Custodian, would have released the $8 million dollars as instructed. Further, Plaintiff maintains that by allowing the removal of funds, Defendant "knowingly accept[ed] a deposit for a particular purpose and then act[ed] to defeat the purpose for which that deposit was made." *American Sec. Bank v. Kaneshiro*, 67 Haw. 354, 356, 688 P.2d 254, 255 (1984). In support thereof, Plaintiff contends that Defendant released the funds in violation of a March 15, 1994 letter instructing Defendant "to seek our approval for the removal of funds."[7] Plaintiff additionally contends that Defendant was obligated to make a reasonable effort to maintain the quality of the assets held in the Account.[8]

"A negligence action lies only when the defendant owes a duty to the plaintiff," *Hao v. Campbell Estate*, 76 Hawai'i 77, 80, 869 P.2d 216, 219 (1994), "requiring the actor to conform to a standard of conduct for the protection of others against unreasonable risks." *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 366, 833 P.2d 70, 74 (1992). Duty in a negligence action may be defined by common law or by statute. *Lee v. Corregedore*, 83 Hawai'i 154, 172, 925

6. In its Opposition, Plaintiff asserts that the tort claims "also incorporate separable instances of actions and inactions which fell short of the good faith exercise of reasonable care under the circumstances. These include, for example, failing to notify NALICO of the withdrawal over NALICO's objection and failure to obtain comfort that a proper valuation had been undertaken by IEL to ensure that the Securities substituted were within 'Investment Parameters.'" Plaintiff's Memo. in Opp., 27. The court would note that there is absolutely no evidence that Defendant allowed a substitution of securities after receiving objection from NALICO. Rather, the evidence put forth demonstrates that NALICO objected to the Remic and Meadows securities *after* the substitution was complete. Furthermore, the court would note that Plaintiff can point to no legal or factual basis for these alleged duties which contradict the express language of the Custodial Agreement.

7. Following the March 15 letter, however, NALICO sent a fax dated March 17, 1994, directly to Defendant stating that "our position in that letter in no way hinders IEL's ... ability to substitute securities as provided for under our agreement in Paragraphs 3(a) and (b)." Plaintiff's S/F, Exh. F. As discussed above, the transaction in dispute fell squarely within the scope of § 3.

8. This obligation is not contained within the Custodial Agreement, but is contained in Plaintiff's Statement of Facts. The court notes that the Evidentiary Support for this "fact" is the declarations of three of Plaintiff's experts, and that none of the declarations cited support the contention that Defendant has the duty to maintain the quality of assets held.

P.2d 324, 342 (1996). In determining whether a duty exists, Hawaii courts are guided by the following principles:

> First, [t]he existence of a duty, that is, whether such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of a plaintiff who has suffered invasion is entitled to legal protection at the expense of a defendant—is entirely a question of law. Second, 'whether a duty exists is a question of fairness that involves a weighing of the nature of the risk, the magnitude of the burden of guarding against the risk, and the public interest in the proposed solution.' Third, we will not 'impose a new duty upon members of our society without any logical, sound, and compelling reasons taking into consideration the social and human relationships of our society.'

*Id.* (internal citations omitted).

In the instant circumstances, Plaintiff has pointed to no source supporting the imposition of a duty to monitor and to report on the substitution of securities. To the contrary, there is a document, the Custodial Agreement, which specifically states that Defendant does not possess this duty. To impose a tort burden in direct contradiction to the express written terms of the contract negotiated at arms length between parties of equal sophistication would place the Custodian in the unenviable position of absolute liability. For example, if the court imposed the duty in tort to seek permission from NALICO before permitting substitution of securities, Defendant would then be open to liability for breach of contract to Investors Equity for acting outside the scope of the Custodial Agreement. *See* Custodial Agreement, § 7 ("[t]he Custodian . . . agrees to receive and disburse all assets actually received by it hereunder, but only upon the terms of this Agreement."). Such "absolute" liability was clearly not the intent of the parties in crafting the limitations on the Custodian's duties and liabilities.

Furthermore, the parties involved are sophisticated businesses, negotiating contracts involving millions of dollars. In negotiating the terms of both the Coinsurance Agreement and the Custodial Agreement, the parties themselves weighed the nature of the risks they were taking by entering into the agreements. Without undue burden on the parties, the agreements could have imposed a higher duty of care on the Custodian than they did.[9]

Therefore, after weighing these factors, and remembering that Hawaii courts will not impose a duty without any logical, sound, and compelling reasons, fairness does not permit the imposition of a tort duty, beyond that contractually agreed to, in the instant situation. Accordingly, the court GRANTS Defendant summary judgment on Counts 3 and 5.

### III. *Count 6: Breach of Fiduciary Duty*

In Count 6, Plaintiff alleges that Defendant breached its fiduciary duties by failing to notify NALICO that Investors Equity was withdrawing funds from the Custodial Account, by failing to obtain written permission from NALICO for the withdrawal of funds from the Custodial Account, and by failing to verify that Investors Equity had deposited in the Custodial Account, prior to withdrawal of cash, assets and securities equal to the amount withdrawn. Complaint, ¶ 71. This count is premised in part on Plaintiff's allegation that Defendant transferred $8,225,523.74 on March 28, 1994 to Investors Equity accounts at Nomura Securities, Smith Barney Shearson, and ADM Investors Services, Inc. and that securities were not simultaneously deposited into the account.

Defendant contends that summary judgment is warranted on two alternative grounds. First, Defendant argues that it was not a fiduciary of NALICO with respect to the facilitating of transactions at the direction of Investors Equity. Second, Defendant maintains that even if it had fiduciary duties as custodian, these duties did not include an obligation to ensure the simulta-

---

9. It is reasonable to assume that if Defendant had agreed to assume additional duties it would have been in return for greater compensation. First Hawaiian Bank was not asked by the parties to assume additional duties and no additional compensation was paid.

neous substitution of assets equal to the amount of the assets withdrawn or to obtain approval from NALICO before facilitating the purchase of securities.

Plaintiff contends that the issue is not whether Defendant had a duty to evaluate the market value of the securities, but whether a reasonable fiduciary would have allowed the substitution of "junk" bonds. In other words, Plaintiff characterizes the case as such: "This is not a case about a failure to monitor investments, as the Bank would urge. It is far more basic. It is about a fiduciary that negligently and with reckless indifference to the interests of its beneficiary allowed a trust account to be plundered." Plaintiff's Memorandum in Opposition at 3.

> In Pennsylvania,
> It is well settled that no particular form of words or conduct is necessary to create a trust ... The question is whether the agreements taken as a whole evidence an intent by appellants 'to impose upon a transferee of the property equitable duties to deal with the property for the benefit of another person.' 'To determine whether there is a trust we are to look, not at the title given, but at the powers and duties conferred.' ... 'A trust is a relation between two persons, by virtue of which one of them as trustee holds property for the benefit of the other. The term 'trust' is a very broad and comprehensive one. Every deposit is a trust, except possibly general bank deposits; every person who receives money to be paid to another or to be applied to a particular purpose is a trustee.'

*R.P. Russo Contractors & Eng'rs, Inc. v. C.J. Pettinato Realty & Dev. Inc.,* 334 Pa.Super. 72, 482 A.2d 1086, 1089 (Pa.Super.1984) (internal citations omitted).

In Hawaii, a "fiduciary relation exists between parties where there is a relation of trust and confidence between them, that is, where confidence is reposed by one party and the trust accepted by the other." *Meheula v. Hausten,* 29 Haw. 304, 314 (1926). Whether a trustee is liable for damages to a trust or an income beneficiary due to the trustee's breach of fiduciary duties will depend on the facts and circumstances on a case by case basis. *In re Estate of Dwight,*

67 Haw. 139, 144, 681 P.2d 563, 567 (1984); *Hartmann v. Bertelmann,* 39 Haw. 619, 626 (1952).

In reviewing this issue, the court would note that it has conducted extensive research on the subject of the liability of a custodian for the alleged mismanagement of funds by a separate entity entrusted with investment authority and has found little authority on point and the parties have cited the court to none. In fact, there is very sparse case law regarding the duties of a custodian generally.

> One case in New Jersey mentions that
> There are three types of securities accounts typically employed by banks and brokerage firms: a custodian account, a discretionary account and a custodian management account. The duty to the customer and the degree of management responsibility assumed vary with the type of account. In a custodian account, the responsibility to the customer is minimal, because the custodian merely holds, buys or sells, transfers or receives securities as directed by the customer. Maximum responsibility is assumed in a discretionary account.

*Erlich v. First Nat'l Bank of Princeton,* 208 N.J.Super. 264, 505 A.2d 220, 232 (N.J.Super.L.1984). In *Erlich,* the court held that in the context of a custodian management account, the bank could not rely upon an exculpatory clause to relieve itself from liability for its own investment decisions. *Id.* at 288, 505 A.2d 220.

In the instant circumstances, a fiduciary relationship did arise between Defendant on one side and NALICO on the other with the creation of the Custodial Account. While the corresponding duties are not as great as that with a general trustee because Defendant had no investment responsibilities, Defendant did have a minimal duty to protect the trust.

At the same time, however, Defendant can have no greater duty than that contained within the Custodial Agreement. *See* Restatement (Second) of Agency § 376 ("existence and extent of the duties of the agent to the principal are determined by the terms of the agreement between the parties,

interpreted in light of the circumstances under which it is made ...").  The Custodial Agreement contains the parties' intentions, and the court will not supplement the contract with duties not contained therein.  As discussed in detail above, the Custodial Agreement did not require notification of the parties or the acquisition of permission from NALICO before investment of funds.  The court will not impose a fiduciary duty that adds additional, potentially contradictory, duties to an express agreement of sophisticated parties negotiated at arms length.

■ Plaintiff additionally contends that Defendant breached its fiduciary duty by accepting securities that were worthless on their face.  Acknowledging that Defendant may have had no duty to value securities, Plaintiff maintains that Defendant could not accept patently worthless securities without violating a fiduciary duty.

However, Plaintiff's expert evidence indicates that these securities were not patently worthless on their face, but rather that Defendant acted recklessly by accepting the securities "without even the most basic inquiry."  Peavy Declaration ¶ 9f–j, attached to Plaintiff's S/F; *see* Foley Declaration, attached to Plaintiff's S/F (characteristics of bonds as well as discrepancy between fair market value and par value demonstrates Defendant was negligent in accepting bonds).  The contract clearly released Plaintiff from conducting any inquiry whatsoever.  Moreover, Plaintiff was given no discretion to act contrary to the Custodial Agreement; no provision was made regarding procedure should Plaintiff deem the substitute securities improper.  The failure of both the Coinsurance Agreement and the Custodial Agreement to provide for approval by Plaintiff before substitution of securities does not place the duty to regulate the substitutions on the back of the Custodian.  Rather, this omission is born by the Plaintiff.

■ Finally, Plaintiff alleges that Defendant breached its fiduciary duty by failing to verify that Investors Equity had deposited substitute assets before releasing the purchasing funds from the Account.[10]  Plaintiff

maintains that because the substitution was delayed, it may have lost secured status with regards to the securities in the Account.

The terms of the Custodial Agreement do not expressly provide that the acquisition of securities must occur simultaneously with the release of funds from the Custodial Account.  The Agreement does, however, provide that within 15 days of the end of each calendar quarter, Investors Equity shall deposit additional securities necessary to cause the fair market value on deposit to be equal to the outstanding reserves.  Custodial Agreement, § 2(b).  Read in connection with the provision following that sentence, that the Custodian has no duty to valuate the substitute securities, it is clear that Investors Equity could have, within the terms of the Custodial Agreement, substituted *one* Remic bond for the $8 million dollars held in reserves, used the remaining millions for its own investments, and then deposited sufficient substitute securities at the end of the calendar quarter.  In such a scenario, Plaintiff would also be at risk of being unsecured with regard to the securities in the Custodial Account.

Further, there is nothing in the Custodial Agreement that which expresses that any substitution should occur simultaneously for the purpose of protecting Plaintiff's secured status.  Indeed, § 2(e) expressly provides that

> The Custodian makes no representation or warranty as to the legality, validity or enforceability of the security interest in the Securities on deposit in the Custodial Account granted or perfected, ... and, except for holding such Securities in accordance with the terms and conditions of this Agreement, shall have no duty hereunder in connection with the granting or perfection of such security interest.

Custodial Agreement, § 2(e).

The court will not cure the limitations of the written agreement by imposing duties not contained therein.  Accordingly, Defendant's Motion for Summary Judgment on Count 6 is GRANTED.

---

10.  Defendant contends that the substitution was in fact simultaneous.  *See* Defendant's Motion, p. 12 n. 6.  For purposes of the instant motion, however, to avoid a factual question, Defendant accepts Plaintiff's allegation as true.

## IV. Count 7: Fraudulent Misrepresentation

In Count 7, Plaintiff alleges that Defendant's representation that it was a responsible banker and custodian, and as such would safeguard NALICO's assets, was a knowing actionable misrepresentation.

Defendant contends that this claim is procedurally and substantively defective. First, Defendant argues that Plaintiff has failed to allege fraud with particularity, in violation of Federal Rule of Civil Procedure 9, by not specifying when the allegedly fraudulent statements were made, why the statements are false, or otherwise providing any facts in support of their claim. Furthermore, Defendant asserts that the general representation that it is a "responsible banker" is not a misrepresentation of fact sufficient to support a claim of fraud. Rather, Defendant contends that such a representation is an expression of opinion or mere "puffing."

In opposition, Plaintiff maintains that in the Custodial Agreement, Defendant "both explicitly and implicitly represented that it would safeguard NALICO's assets, and that it was competent to do so." Plaintiff's Memorandum in Opposition at 45. Plaintiff asserts that these allegations are incorporated into the Count, thereby satisfying the particularity requirement. Plaintiff concludes that it is clear the Bank had no intention of safeguarding the assets of NALICO, and therefore the representations noted above are false.

■■■■ In Pennsylvania, in order to maintain a cause of action for fraudulent misrepresentation, there must be (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation, and (5) damage to the recipient as the proximate result. *Edmondson v. Zetusky*, 674 A.2d 760, 765 (Pa.Cmwlth.1996) (citing *Savitz v. Weinstein*, 395 Pa. 173, 149 A.2d 110 (Pa.1959)). A negligent misrepresentation differs from an intentional misrepresentation in that to commit a negligent misrepresentation, the speaker need not know that his words are untrue, but must have failed to make a reasonable investigation of the truth of those words.

*Gibbs v. Ernst*, 538 Pa. 193, 647 A.2d 882, 890 (Pa.1994).

■■■■ Plaintiff has failed to specify which portion of the Custodial Agreement represents that Defendant would safeguard NALICO's assets beyond the express terms of the agreement discussed above. Likewise, Plaintiff has failed to demonstrate why "it is clear" that Defendant had no intention of safeguarding NALICO's assets. The court has carefully and exhaustively reviewed the Custodial Agreement. It contains no representation at all about Defendant's obligation to safeguard assets in terms of assuring valuation. Moreover, Plaintiff has provided no evidence which would support a finding that an implicit representation was made. As has been discussed above, the express provisions of the agreement relieve Defendant from any duty to assess valuation. As such, the court finds that Plaintiff has failed to demonstrate its burden that a genuine issue of fact remains as to the existence of a misrepresentation. Accordingly, the court GRANTS Defendant summary judgment on Count 7.

## V. Counts 8, 9 & 10: Fraudulent Transfers under Pennsylvania law

In Count 8, Plaintiff asserts a claim under 40 Pa.Stat.Ann. § 221.28 seeking damages in an amount exceeding $8,000,000. In Counts 9 and 10, Plaintiff seeks to set aside the transfers made from Defendant to Investors Equity as fraudulent conveyances under 39 Pa.Stat.Ann. §§ 353 & 354. Plaintiff did not oppose Defendant's motion for summary judgment on these counts and in a footnote stated "[t]he Plaintiff has respectfully decided to withdraw the Pennsylvania Statutory Counts." Plaintiff's Memorandum in Opposition at 45, n. 35.

Therefore, there being no genuine issue of fact remaining, the court GRANTS Defendant summary judgment on Counts 8, 9 and 10.

## VI. Count 1: Request for Injunctive Relief

In Count 1, Plaintiff seeks an order commanding the Defendant, as Custodian of the Custodial Account, to turn over to Plaintiff the collateral, assets and security in the Cus-

todial Account, in accordance with NALICO's security interest and the Custodial Agreement.[11]

■■■ This count does not assert a direct claim of liability against Defendant, but rather raises the issue of ownership of the Account. Undoubtedly, Investors Equity has an interest in the resolution of the ownership of the assets in the Custodial Account,[12] and Defendant could possibly be subjected to multiple liability if the ownership of the account is not resolved in one proceeding.

The court therefore directs Defendant to interplead Investors Equity and deposit the balance of the funds it now holds into the registry of this court. After such is accomplished,[13] the court will discharge Defendant from the action, as Defendant claims no interest in the funds currently held in the Custodial Account.

Accordingly, the court DENIES WITHOUT PREJUDICE the Motion to Dismiss Count 1.

## CONCLUSION

Under the Custodial Agreement, NALICO, Investors Equity, and First Hawaiian Bank provided that First Hawaiian Bank was to act as custodian for funds placed into a custodial account by NALICO and to be invested by Investors Equity. First Hawaiian Bank's duties were specifically limited; the Agreement explicitly provided that First Hawaiian had no duty to evaluate the fair market value of any securities placed in the account. Moreover, First Hawaiian was not given any discretionary authority to reject the substitutions proposed by Investors Equity.

NALICO objects to the investment choices that were made. Because Investors Equity is now in liquidation, NALICO cannot easily remedy the situation in which it finds itself. Understandably, NALICO would like to re-

cover the funds it turned over to Investors Equity. In light of the express language placed in the Custodial Agreement, however, there is no basis of recovery against First Hawaiian Bank in tort, contract, or under agency fiduciary principles.

Accordingly, for the reasons stated above, the court GRANTS Defendant's Motion for Summary Judgment as to Counts 2 through 10 and DENIES WITHOUT PREJUDICE Defendant's Motion to Dismiss Count 1.

IT IS SO ORDERED.

---

11. Defendant moved to dismiss this count for failure to join Investors Equity as an indispensable party. In opposition, Plaintiff contends that there is no evidence that joinder is not feasible or that Investors Equity is necessary to the action. In its reply, Defendant stated that it has no objection to the joinder of Investors Equity, if Investors Equity can in fact be properly joined.

12. Especially in light of the fact that according to the Complaint, NALICO has made demands on Investors Equity Liquidator that the Custodial Account be turned over and these demands have been rejected. Complaint, ¶¶ 42–43.

13. If Investors Equity cannot be brought into the action, upon proper motion, the court will again address Defendant's motion to dismiss for failure to join a necessary and indispensable party.